UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RICHARD HISERT, Manager, on behalf of H2H ASSOCIATES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> BLUE WATERS DREDGING LLC, DAVID URBANI, HERBERT HASCHEN, and DOROTHY B. WILLIAMS, <br><br> Defendants. | Civil Action No. 16-11960-FDS |

## MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action arising out of a contract dispute concerning a marine dredging project. Jurisdiction is based on diversity of citizenship.

In July 2015, the Army Corps of Engineers awarded H2H Associates, LLC a contract for a dredging project in Cohasset Harbor in Massachusetts. H2H subcontracted with Blue Waters Dredging LLC ("BWD") to perform work on that project.[1] The complaint alleges that BWD failed to perform under the contract as promised and that its members repeatedly made false statements and threats to induce H2H to make payments not due under the contract. It alleges three counts under Massachusetts law for breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud.

---

[1] Based on the filings of the parties, it appears that H2H sets off the abbreviation "LLC" with a comma, and BWD does not.

Defendant Herbert Haschen, defendant David Urbani, and plaintiff Richard Hisert have separately moved for summary judgment. For the following reasons, Urbani's motion will be granted; Haschen's motion will be denied; and Hisert's motion will be denied.

I.  **Factual Background**

H2H Associates, LLC, is a limited liability company organized under New York law. (Hisert Aff. ¶ 3; Pl. SUF ¶ 1). Richard Hisert, a resident of New York, is the managing member of H2H. (Hisert Aff. ¶ 2).

Blue Waters Dredging LLC was a limited liability company organized under Maryland law. (Hisert Aff. ¶ 5; Pl. SUF ¶ 2; Def. Urbani SUF ¶ 7). At the times relevant here, BWD had three members: Herbert Haschen and Dorothy Williams, who each owned a 40% share of the company, and David Urbani, who owned the remaining 20%. (Pl. SUF ¶ 2; Def. Haschen; SUF ¶ 1; Def. Urbani SUF ¶ 13). All are residents of Maryland.

Urbani was also the sole member of Morris Street Financial LLC, a limited liability company formed in approximately February 2015 to "lend money and lease equipment." (Pl. SUF ¶ 3, Ex. 1 at 24, 26-31; Hisert Aff. ¶¶ 8-9; Def. Urbani SUF ¶ 17). Although MSF had loan agreements with other customers, it leased equipment only to BWD. (Pl. SUF ¶ 3, Ex. 1 at 24, 26-31; Urbani SUF ¶ 16, 18).

A.  **The Prime Contract with the ACOE**

On July 13, 2015, the Army Corps of Engineers awarded H2H a contract to dredge Cohasset Harbor in Massachusetts. (Hisert Aff. ¶ 4, Ex. 1; Pl. SUF ¶ 4). The contract required H2H to maintain sufficient capacity and equipment to complete the project by January 31, 2016, and to propose a schedule of equipment needed to meet that deadline. (Pl. SUF Ex. 4 at 13; Pl. SUF Ex. 12 at 5). The contract also required H2H to secure a 100% performance and payment

2

bond. (Pl. SUF ¶ 8).

### B. The Subcontract with BWD

On August 27, 2015, H2H subcontracted with BWD to provide all "labors, materials, equipment and services" necessary to dredge the harbor for a price of $1,194,611. (Hisert Aff. ¶ 6, Ex. 2 at 2; Pl. SUF ¶ 5).

That same day, BWD sent H2H a list of specifications of the equipment it intended to use on the project. (Pl. SUF ¶ 23). H2H forwarded BWD's specifications to the Corps of Engineers, as was required under the prime contract, and the Corps approved the specifications. (Pl. SUF ¶¶ 24-25).

### C. The Lease of the Booster Pump

The specifications submitted by BWD and approved by the Corps of Engineers included an Ellicott Series 670 Booster Pump that was necessary to perform the dredging work. (Pl. SUF ¶ 23). When BWD representatives arrived at Cohasset Harbor on October 3, 2015, however, the company did not yet have the booster pump, and thus was unable to start dredging. (Pl. SUF ¶ 30; Def. Urbani ¶¶ 30-31).

As of October 22, BWD still did not have a booster pump, and the project had not begun. That day, H2H project manager Jennifer Popp e-mailed Haschen requesting that BWD respond by close of business with a plan for procuring the booster to "ensure no further delays" to the project. (Hisert Aff. ¶ 15; Hisert Aff., Ex. 4 at 3).

Haschen responded to H2H later that evening. (Hisert Aff. Ex. 4 at 2). In his response, Haschen wrote that he had "contracted with a dredging company out of Long Island better than a month ago to build [BWD] a booster that . . . would have saved me [] $100,000," but that the delivery of the booster had been delayed. (*Id.*). He estimated that he expected the Long Island

3

booster pump to arrive by the "end of next week." (*Id.*). He did not, however, tell H2H that he had actually paid Joseph Edgar, a member of the Long Island dredging company, $100,000 on September 6, 2015. (Pl. SUF ¶ 28). He also did not tell H2H that he had never requested a refund from Edgar, or that BWD had in fact retained Edgar as a paid consultant. (Pl. SUF ¶¶ 31, 32; Pl. SUF, Ex. 23).

With delivery of the Long Island booster pump more than a week away, Haschen informed H2H that the "best/fastest option to get a booster on site" would be to lease one from Ellicott Dredge in Baltimore. (Hisert Aff, Ex. 4 at 3). Haschen told H2H that because BWD was in a "tight spot with cash flow," he needed a $70,000 "advanc[e]" to pay the lease for the booster pump. (*Id.*). Seeking to "exhaust every effort . . . to begin pumping operations . . . next week," H2H wired $70,000 directly to Ellicott Dredge the next day, October 23. (Hisert Aff. ¶ 17; Hisert Aff. Ex. 3 at 2; Hisert Aff., Ex. 5 at 2). The leased booster pump arrived at the work site on October 27, four days later, and BWD commenced dredging on November 3. (Pl. SUF, Ex. 1 at 30; VAC ¶ 39). On November 12, H2H paid BWD $252,154—the amount called for in BWD's original invoice ($322,654) less the $70,000 H2H had sent to Ellicott Dredge on October 23. (Hisert Aff. Ex. 5).

D.   **Additional Delays in Performance**

The dredging project soon experienced significant additional delays. (Pl. SUF, Ex. 2 at 62; Def. Urbani SUF ¶ 23). Nonetheless, BWD contacted H2H on both November 29 and 30 and threatened to stop work unless H2H paid BWD amounts it had not yet earned under the subcontract. (Pl. SUF ¶ 38). H2H complied with BWD's demands and sent it $62,476.79 on December 14. (Hisert Aff. ¶ 21; Hisert Aff., Ex. 5).

On December 22, Urbani contacted Hisert for the first time. He introduced himself by

4

e-mail as both the "silent partner" of BWD and the "principle [sic] member of the finance company funding BWD." (Hisert Aff., Ex. 6). He told Hisert that BWD "basically came to [H2H's] rescue," and blamed Hisert for his "unilateral decision" to lease the booster pump from Ellicott Dredge. (*Id.*). He also informed Hisert that BWD had incurred significant operating, capital, and payroll costs on the project. (*Id.*). He concluded by stating "I think it would be appropriate for H2H to advance BWD funds until the payments for yards dredged start[] flowing." (*Id.*).

On December 29, Haschen e-mailed Hisert that BWD was "out of available operating cash." (Pl. SUF ¶ 39; Hisert Aff., Ex. 8). Haschen asked Hisert for an additional "payment" and warned that he didn't "want to stop" the project. (*Id.*). Later that day, H2H sent $262,643.28 to BWD. (Hisert Aff. ¶¶ 22-23; Exs. 5 & 8).

On January 18, 2016, Williams sent H2H an e-mail stating that BWD was unable to "pay[] off outstanding invoices." (Def. Urbani SUF, Ex. 8). On a conference call the next day, H2H agreed to make four "weekly payments" to BWD to assist with, among other things, outstanding vendor invoices. (*Id.*). H2H required BWD to give "advance[] notice to H2H if there [was] a concern over monies." (*Id.*).

H2H made three such "weekly payments" of $75,000 to BWD on January 20, January 25, and February 3. (Hisert Aff. ¶ 27). On February 4, Urbani sent Hisert an e-mail threatening that BWD would cease dredging operations unless H2H either shared all proceeds from the prime contract with BWD or, in the alternative, assumed all of BWD's assets and liabilities, including a $325,000 debt owed to Urbani's company, Morris Street Financial. (Pl. SUF ¶ 50; Pl. SUF, Ex. 1 at 192-205, 206-07; Pl. SUF, Ex. 26; Hisert Aff. ¶ 29).

On February 6, Urbani sent another e-mail to Hisert stating that BWD would continue

5

operations only if, among other things, H2H agreed to make an immediate lump-sum payment of $80,000. (Pl. SUF ¶ 51; Pl. SUF, Ex. 27; Hisert Aff. ¶ 33). H2H did not make the $80,000 lump-sum payment; however, on February 10 it paid BWD the final of the four $75,000 weekly payments. (Pl. SUF ¶ 52; Pl. SUF, Ex. 5).

After a few more days of attempting to re-negotiate the contract, BWD quit the job on February 20, 2016. It maintained that it did so because it had run out of money. (Pl. SUF ¶ 22; Pl. SUF, Ex. 1 at 172; Def. Urbani SUF ¶ 48).

### E. The Lien Waivers

Over the course of their contractual relationship, H2H made eight payments to BWD totaling $947,774.07. (Pl. SUF ¶ 19; Pl. SUF, Ex. 5).[2] On seven occasions after receiving payments from H2H, BWD completed and submitted "Partial Lien Waiver[s]" that "certif[ied] that all obligations for labor, services, equipment, materials, all taxes, licenses, fees and or insurance; and all other bills, which arose in any manner in connection with the performance of the Subcontract between Subcontractor Blue Waters Dredge [sic] LLC and the Contractor H2H Associates, LLC on Job Number #700.01—Maintenance Dredging of Cohasset Harbor and Beach Nourishment ha[d] been paid in full, and that there [were] no unsatisfied claims for such items . . . of said Subcontract." (Pl. SUF, Ex. 31).[3] Six of the seven partial lien waivers were signed by Williams; the other, which was completed on December 30, 2015, was signed by Haschen. (*Id.* at 5).

H2H contends that at the time Haschen signed the lien waiver, BWD had open vendor

---

[2] The payments from H2H to BWD were as follows: (1) $70,000 on October 23, 3015; (2) $252,154 on November 12, 2015; (3) $62,476.79 on December 14, 2015; (4) $262,643.28 on December 29, 2015; (5) $75,000 on January 20, 2016; (6) $75,000 on January 25, 2016; (7) $75,000 on February 3, 2016; and (8) $75,000 on February 10, 2016. (Pl. SUF, Ex. 5).

[3] Lien waivers were completed as follows: (1) November 5, 2015; (2) December 10, 2015; (3) December 29, 2015; (4) December 30, 2015; (5) January 20, 2016; (6) January 25, 2016; and (7) again on January 25, 2016.

6

invoices of more than $653,000. (Pl. SUF ¶ 56). Urbani disputes that contention, and Haschen contends that he has "no knowledge" as to its truth. (Def. Urbani Resp. to Pl.'s SUF; Def. Haschen Resp. to Pl.'s SUF).

## II. Procedural Background

On September 29, 2016, H2H brought this action against BWD, Urbani, Haschen, Williams, and Edgar. BWD filed a motion to dismiss the complaint and compel arbitration, and Urbani filed a motion to dismiss. The Court denied both motions without prejudice.

On March 8, 2017, H2H filed an amended complaint. The amended complaint substituted Richard Hisert on behalf of H2H as plaintiff, and dropped the claim against Edgar. The amended complaint alleges three counts against Urbani, Haschen, and Williams under Massachusetts law: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, and (3) fraud.

Urbani renewed his motion to dismiss on March 22, 2017. Haschen filed a motion to dismiss on April 10, 2017.[4] Both defendants argued that all three counts should be dismissed.

On June 20, 2017, the Court granted Haschen's motion as to Counts 1 and 2, but denied the motion as to Count 3, and denied Urbani's motion as to all counts.

Urbani, Haschen, and Hisert have now separately moved for summary judgment.

## III. Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is

---

[4] BWD apparently did not renew its motion to dismiss because by that point H2H had conceded that its claims against BWD should be dismissed due to a contractual provision that required arbitration.

7

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

## IV. Analysis

### A. Counts One and Two – Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing

Counts One and Two allege claims for breach of contract and breach of the implied covenant of good faith and fair dealing, respectively. Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract; a breach of the covenant "exists only where there is an enforceable contract between the parties." *Burnett v. Flagstar Bank*, 2012 WL 3257884, at *1 (D. Mass. Aug. 7, 2012). Thus, to state a claim for breach of contract or breach of the implied covenant, the amended complaint must generally allege that there was a valid contract between the parties. *See Blake v. Prof'l Coin Grading Serv.*, 898 F. Supp. 2d 365, 388 (D. Mass. 2012).

The parties to the contract at issue here were H2H and BWD, not Urbani. Urbani thus

can only be found liable on the conduct on a theory of "piercing the corporate veil." Under that doctrine, individual members of an LLC may be held liable for the acts of the company "where they control the operation of the [company] and run it for their personal benefit, and where justice requires that the separate existence of the corporation be ignored." *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 16 (1st Cir. 1985) (applying doctrine to corporation); *see also Middlesex Ret. Sys., LLC v. Bd. of Assessors of Billerica*, 453 Mass. 495, 504 (2009) (applying doctrine to LLC).[5]

Twelve factors guide the application of the doctrine of piercing the corporate veil: "(1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) non-functioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud." *Attorney Gen. v. M.C.K., Inc.,* 432 Mass. 546, 555 n.19 (2000); *see also Pepsi–Cola,* 754 F.2d at 14–16.

The first two factors are better suited to a case where a court is considering whether one entity should be held liable for the actions of a second entity. *See George Hyman Const. Co. v. Gateman*, 16 F. Supp. 2d 129, 150 (D. Mass. Sept. 2, 1998) (noting that "some" of the factors "may seem better suited" to piercing the veil in a case involving a second company as a defendant, and some categories better suited to piercing the veil in a case involving individuals

---

[5] The doctrine of "piercing the corporate veil" is not a cause of action, but instead is an equitable remedy that may be applied where it is necessary "to provide a meaningful remedy for injuries and to avoid injustice." *Middlesex Ret. Sys., LLC*, 453 Mass. at 504; *see also My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 618 (1968) (allowing veil-piercing for the purpose of "defeating fraud or wrong, or for the remedying of injuries").

9

as defendants). Because Hisert is attempting to hold an individual members liable for BWD's actions, the first and second factors are not particularly relevant here.

The third factor—the confused intermingling of business assets—does not favor application of the doctrine here. It is undisputed that BWD and MSF had transactions with one another. Among other things, MSF provided BWD with a line of credit of nearly $700,000. It is true that MSF leased substantial amounts of equipment to BWD; in fact, MSF never leased equipment to any customer other than BWD. Throughout the relationship between H2H and BWD, MSF frequently received payments from BWD after BWD had received payments from H2H. And in a February 4, 2016, e-mail, where Urbani (on behalf of BWD) was attempting to renegotiate the subcontract with H2H, Urbani threatened H2H that BWD would stop dredging unless H2H assumed all of BWD's liabilities, including a $325,000 debt it owed to MSF. But there is no evidence that any assets or liabilities of the two entities were ever actually intermingled, that Urbani's personal assets were co-mingled, or that H2H was confused or misled as to which entity it was dealing with.

The fourth factor—whether BWD was thinly capitalized—favors, at least somewhat, piercing the corporate veil. The principal "focus of the capitalization inquiry" is normally on "the adequacy of [the] *initial* funding." *George Hyman Const. Co.*, 16 F. Supp. 2d at 152 (the inquiry's "'pertinent question' is whether capital was 'too thin' to do the job at hand") (quoting *Evans v. Multicon Const. Co.*, 30 Mass. App. Ct. 728, 734 (1991)). Although there is no evidence as to BWD's initial capitalization, it is a fair inference that BWD never had adequate capital to perform the work in question, and it appears that all progress payments were promptly transferred out of BWD rather than put back into the business. This factor thus favors piercing of the veil.

The fifth factor is failure to observe corporate formalities. There is no evidence that BWD failed to do so.

The sixth factor is an absence of corporate records. Hisert contends that "it was clear" from Urbani's deposition testimony that "there were no corporate records" of BWD. However, Hisert did not dispute Urbani's statement of undisputed fact that "BWD maintained corporate records," and accordingly has admitted that fact as true. At a minimum, it is unclear whether BWD failed to maintain proper corporate records, or what the parameters of any such failure may have been.

Finally, Hisert makes no arguments concerning factors seven through twelve.

Weighing all of those factors, Hisert has not provided sufficient evidence to reach the "high threshold" required to pierce the corporate veil under Massachusetts law. *Centurion Networking Serv. Partners, LLC v. Dr. Wade N. Barker, P.A.*, 2018 WL 1972789, at *5 (D. Mass. Apr. 26, 2018) (slip copy). On the available evidence, therefore, Urbani cannot be found personally liable for the obligations of the LLC. Accordingly, the Court will grant Urbani's motion for summary judgment as to Counts 1 and 2.

**B.     Count Three – Fraud**

Count Three alleges fraud against both Haschen and Urbani. An individual is "not immunized as an officer and director of a corporation for the acts he is alleged to have committed personally." *Nader v. Citron*, 372 Mass. 96, 102 (1977). Thus, corporate officers can be personally held liable for fraud or unfair and deceptive practices, even if undertaken on behalf of the entity. *Id.* at 103; *see George Hyman Const. Co.*, 16 F. Supp. 2d at 161 ("a claim under c. 93A, § 11, which extends broadly to persons acting in a business context, may be asserted directly against [individuals] without the benefit of a veil-piercing").

1. **Choice of Law**

The first question is what state's law should apply to the claim of fraud. Haschen contends that Maryland law should apply, and Hisert contends that Massachusetts law should apply; Urbani does not directly address the issue, but cites only Massachusetts authority.

A federal court sitting in diversity applies state substantive law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). To determine which state's substantive law applies, the court looks to the choice of law principles of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).

To ensure a choice-of-law analysis is necessary, courts first "determine whether there is an actual conflict between the substantive law of the interested jurisdictions." *Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 73 (1st Cir. 2006). Here, there are two potentially relevant differences between Maryland and Massachusetts law.

The first difference is the requisite scienter. In Maryland, the fraudulent "misrepresentation must be made with the deliberate intent to deceive." *Smith v. Integral Consulting Services, Inc.*, 2016 WL 4492708, at *10 (D. Md. Aug. 26, 2016) (quoting *Sass v. Andrew*, 152 Md. App. 406, 430 (2003)). Thus, "a defendant may be liable for fraud . . . 'only if he knows that his representation is false, or is recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity.'" *Ellerin v. Fairfax Savings, F.S.B.,* 337 Md. 216, 232 (1995). In Massachusetts, by contrast, although fraud is characterized as an intentional tort, "[p]roof of intent to deceive is not required, so long as there is proof of a false representation of fact susceptible of the speaker's knowledge." *Cummings*, 244 F.3d at 22.

The second difference is the requisite burden of proof. In Maryland, to "prevail on a fraud" claim . . . the plaintiff must prove each . . . element[] with clear and convincing evidence."

12

*Cunney v. Patrick Communications, LLC*, 191 F. Supp. 3d 480, 498 (D. Md. June 13, 2016). In Massachusetts, however, fraud "need not be shown by anything more than the ordinary preponderance of the evidence standard applicable to civil cases in general . . . Massachusetts has not adopted a 'clear and convincing' standard in cases of fraud." *Compagnie de Reassurance D'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 72 (1st Cir. 1995).

There is thus an actual conflict between the substantive law of fraud of Maryland and that of Massachusetts. After concluding that a true conflict exists, a court must look to the choice-of-law principles of the forum state (here, Massachusetts). "Massachusetts applies a 'functional approach to choice of law.'" *Levin*, 459 F.3d at 74 (quoting *Bushkin Assocs., Inc. v. Raytheon Co.,* 393 Mass. 622 (1985)). The functional approach is "explicitly guided by the Restatement (Second) of Conflict of Laws (1971)." *Id.* (quoting *Clarendon Nat. Ins. Co. v. Arbella Mut. Ins. Co.*, 60 Mass. App. Ct. 492 (2004)).

The Restatement addresses the choice-of-law principles for fraud claims in Section 148. Section 148 "focuses on where the representations were at least in part made and received, and where the plaintiff relied on the representation" and distinguishes between (1) situations where the representations and reliance occurred in the same state and (2) those where the representations and reliance occurred in different states. Restatement (Second) of Conflict of Laws (1971), § 148. Because Haschen and Urbani allegedly sent the fraudulent representations from Maryland to H2H in New York, and H2H relied on that representation in New York and Massachusetts, the situation here falls under subsection 2.

Section 148(2) advises courts to consider the following list of "contacts" to "determin[e] the state which . . . has the most significant relationship to the occurrence and parties": (1) where the plaintiff acted in reliance upon the defendant's representation; (2) where the plaintiff

13

received the representations; (3) where the defendant made the representations; (4) the domicile, residence, nationality, place of incorporation and place of business of the parties; (5) the place where a tangible thing that is the subject of the transaction between the parties was situated at the time; and (6) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.[6]

Those factors point in various directions here. The first factor points to Massachusetts and New York, because that is where Hisert acted in reliance on the representation. The second factor points to New York, where Hisert apparently received the representation. The third factor points to Maryland, as the alleged misrepresentation was "made" when Haschen signed the lien waiver in Maryland. The fourth factor points in different directions—H2H was based in New York, BWD was based in Maryland, and Haschen is a resident of Maryland. The fifth factor points to Massachusetts, as the subject of the parties' transactions was the Cohasset Harbor jobsite. And the sixth factor seems not to apply; Hisert has not alleged that any alleged misrepresentation caused H2H to "enter into" a contract.

No party seeks to apply New York law. The question is thus whether the weight of the factors requires the application of Maryland or Massachusetts law. Under the circumstances, it is the Court's judgment that the law of fraud of Massachusetts should control, and for three principal reasons. First, the location of the intended harm normally carries substantial weight in a fraud case. Here, the intended harm to the plaintiff was in New York, Massachusetts, or both;

---

[6] Section 148's "Comment on Subsection 2" provides that the "relative importance" of the factors "in a given case should be determined in light of the choice-of-law principles stated in § 6." Section 6 lists seven principles for a court to consider: (1) the needs of the interstate and international systems, (2) the relevant policies of the forum, (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability and uniformity of result, and (7) ease in the determination and application of the law to be applied. Comment c to Section 6, however, makes clear that the list is not to be considered exclusive, and that courts "will undoubtedly" give consideration to principles not listed. *See* Restatement (Second) of Conflicts of Laws § 6 cmt. c (1971).

because no party seeks to apply New York law, that leaves Massachusetts. Second, as noted, defendant Urbani does not contend that Maryland law should apply, and appears to concede that Massachusetts law should govern. It would be problematic, to say the least, if different sets of laws applied to different defendants. Finally, Massachusetts was the focus of the overall transaction, as the site of the project in question.

Accordingly, the Court will apply Massachusetts law to the claims of fraud against Haschen and Urbani.

### 2. Fraud Claim Against Haschen

To prove a claim for fraud under Massachusetts law, a plaintiff must show that the defendant "made a false representation of material fact; for the purpose of inducing reliance; and that the plaintiff relied upon the representation to his or her detriment." *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 22 (1st Cir. 2001). As noted, "[p]roof of intent to deceive is not required, so long as there is proof of a false representation of fact susceptible of the speaker's knowledge." *Id.* The claimant must in addition "set[] forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir. 2013) (quoting *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009)).

The thrust of the fraud claim against Haschen is that by signing the December 20 lien waiver, he represented to H2H that BWD's suppliers and vendors had been paid, when, in fact, he knew they had not; that H2H capitulated to repeated demands for payments not due under the contract, in reliance on that representation; and that H2H was harmed by that reliance.

The parties primarily disagree over whether Hisert has presented sufficient evidence to prove, as a matter of law, that Haschen had the requisite scienter to commit fraud. Because

15

Haschen contends that Maryland law controls, his argument centers on Hisert's inability to prove that he "kn[ew] the falsity" of the statement on the lien waiver or that he so "reckless[ly] disregard[ed]" the truth that such knowledge should be imputed. Essentially, Haschen contends, Hisert has "at most," proved Haschen made a "negligent misrepresentation," but not a "fraudulent one."

However, Massachusetts law, and not Maryland law, controls the fraud claim here. Therefore, as to scienter, Hisert need only prove that the falsity of the statement was "susceptible of" Haschen's "knowledge."

Hisert's statement of "undisputed" facts includes various assertions that suggest Haschen either knew, or should have known, that BWD owed its vendors money. Four such facts in particular—54, 55, 56, and 57—are relevant here. Those facts, together with Haschen's responses, are as follows:

(54) On December 30, 2015 Haschen signed a lien waiver.

**Haschen Response: Undisputed.**

(55) The lien waivers attest that BWD had paid its subcontractors and suppliers in full.

**Haschen Response: As to the single lien waiver signed by Haschen on December 30, 2015, Haschen was only responding to H2H's request because H2H has made a previous overpayment. See Exhibit D, Summary Judgment Opposition, Affidavit of Herbert Haschen, ¶ 15.**

(56) At the time Haschen signed the December 30, 2015 lien waiver there were [sic] in excess of $653,000 in open vendor invoices.

**Haschen Response: Haschen has no knowledge as to this assertion. Haschen has not seen or otherwise been provided any evidence of amounts due on open invoices as of December 30, 2015. See Exhibit D, Summary Judgment Opposition, Affidavit of Herbert Haschen, ¶ 16.**

(57) Haschen dealt personally with some of the unpaid vendors who had complained to Haschen that they had not been paid.

> **Haschen Response:** Haschen interacted with vendors, some of whom inquired about payments; no one 'complained.' See Exhibit D, Summary Judgment Opposition, Affidavit of Herbert Haschen, ¶ 17.

The affidavit paragraphs to which Haschen cites provide as follows:

(15) Regarding ¶ 55 of plaintiff's SOF, as I explained elsewhere, I signed the December 30, 2015 Partial Lien Waiver at H2H's request in response to Popp's email explaining that she made an overpayment, and that she needed it for her records.

(16) Regarding ¶ 56 of plaintiff's SOF, it is fair to say that I was aware that there were open vendor accounts, I was not aware of an amount. By signing the December 30, 2015 Partial Lien Waiver per Popp's request, I had no intent to deceive nor did I believe that H2H was relying on that waiver because it related to H2H's previous overpayment.

(17) Regarding ¶ 57 of plaintiff's SOF, subs asked about payments. The word "complained" is not accurate. The conversations about payments was no different than on any job or project.

Haschen's responses to Hisert's assertions, as well as his affidavit statements, show that he likely knew—and certainly should have known—that BWD still owed money to its vendors when he signed the lien waiver saying otherwise. In particular, in affidavit paragraph 16, Haschen acknowledges that he was aware that BWD had open vendor accounts. And in affidavit paragraph 17, although he quibbles over Hisert's exact phrasing of "complained," he acknowledges that BWD's "subs" had asked him about payments due to them.

In light of his awareness of the open payments, a reasonable jury could conclude that Haschen should have known that the lien waiver's statement that "all obligations for labor, services . . . which arose in any manner in connection with the performance of the Subcontract . . . have been paid in full" was false and misleading. Again, the question is whether the misrepresentation in lien waiver was "susceptible" of his knowledge. Because Hisert has produced evidence sufficient to make that showing, the Court will deny Haschen's motion for summary judgment as to Count Three. Hisert's cross-motion for summary judgment will

17

likewise be denied, as the Court cannot find, under the circumstances, that Haschen should be found liable for fraud as a matter of law.

### 3. Fraud Claim Against Urbani

Hisert has not opposed Urbani's motion for summary judgment on the fraud claim. Nonetheless, the Court must examine the evidence to ascertain whether summary judgment is appropriate. *Velez v. Awning Windows, Inc.*, 375 F.3d 35, 42 (1st Cir. 2004).

Hisert does not allege that Urbani (unlike Haschen) ever signed a lien waiver. Instead, he alleges that Urbani received copies of all the lien waivers and that he knew they were false. In addition, he alleges that Urbani "caused the language of the lien waivers to be negotiated so that the lien waivers did not need to indicate that vendors had not been paid." That allegation relies primarily upon Urbani's deposition testimony.

At his deposition, Urbani testified that Williams had originally told H2H that BWD "could not" represent that it had paid all its vendors. Accordingly, Urbani said, he and the other BWD members "went around and around renegotiating the language" of the first lien waiver so that it would be considered only a "partial" waiver. By titling the waiver as "partial," Urbani said, he assumed that BWD was only stipulating to "using the money paid to" it "by H2H to pay [its own] vendors," and not for any other purpose.

In his motion for summary judgment, Urbani contends that his involvement with "the drafting of [the lien waiver's] language address[ed] a single, discrete issue applicable to mobilization payments BWD believed it was not owed." Urbani contends that there is "no evidence" he "made any . . . representations that he knew or should have known were false."

The evidence is certainly troubling, as it suggests that Urbani may have intended to deceive BWD, and actively assisted in preparing language that was intended to obfuscate.

18

Nonetheless, the Court is unable to conclude, that Urbani either made a false statement or caused such a statement to be made. Proof of fraud requires proof of a false statement, and there is no evidence Urbani made one. Accordingly, Urbani's motion for summary judgment as to Count Three will be granted.

## V.     Conclusion

For the foregoing reasons,

1. The motion for summary judgment of defendant David Urbani is GRANTED as to Counts One, Two, and Three.

2. The motion for summary judgment of defendant Herbert Haschen is DENIED.

3. The motion for summary judgment of plaintiff Richard Hisert is DENIED.

**So Ordered.**

Dated:  November 16, 2018

/s/  F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge